## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 11 B 04386 |
| | ) | (Jointly Administered) |
| Fairview Ministries, Inc., et.al[1] | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | The Honorable Timothy A. Barnes |
| | ) | |
| | ) | |
| David R. Brown, not individually but as | ) | |
| Chapter 7 Trustee of the Bankruptcy | ) | |
| Estates of Fairview Ministries, Inc., | ) | |
| Fairview Village, Fairview Baptist Home | ) | |
| d/b/a Fairview Center for Health & | ) | |
| Wellness, Fairview Residence of Rockford | ) | |
| d/b/a Crimson Pointe, and Vibrant Living | ) | |
| Communities & Services, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adversary No. _____ |
| | ) | |
| Richard W. Olson, Mila G. Carlson, | ) | |
| Robert Carlson, Rodney C. Dahlin, | ) | |
| Bruce V. Erickson, James G. Erickson, | ) | |
| Timothy S. Hultgren, Warren N. Jensen, | ) | |
| Carol E. Middleton, Carol Schaub, | ) | |
| David Schleicher, Robert L. Smyth, | ) | |
| Richard S. Walker, Douglas Walton, | ) | |
| John Westra, James T. Whitman, and | ) | |
| Donald E. Zimmerman, | ) | |
| | ) | |
| Defendants. | ) | |

## ADVERSARY COMPLAINT

David Brown, not individually but solely in his capacity as Chapter 7 trustee (the

"Trustee") of the bankruptcy estates (the "Estates") of Fairview Ministries, Inc. ("Fairview

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Fairview Ministries, Inc. (2067), Fairview Village (2068), Fairview Baptist Home, d/b/a Fairview Center for Health & Wellness (9812), Fairview Residence of Rockford, d/b/a Crimson Pointe (8394), and Vibrant Living Communities & Services (1604).

Ministries"), Fairview Village, Fairview Baptist Home d/b/a Fairview Center for Health & Wellness ("Fairview Baptist Home"), Fairview Residence of Rockford d/b/a Crimson Pointe ("Fairview Residence of Rockford"), and Vibrant Living Communities & Services (collectively, the "Debtors"), as his Complaint against the above captioned Defendants, states as follows:

## Nature Of The Action

1.      The Debtors in this case owned and operated continuing care retirement communities in Downers Grove and Rockford, Illinois.  In 2007, the facilities owned and operated by the Debtors were in serious need of capital improvements.  Therefore, the Debtors decided to raise additional capital by issuing bonds in order to pay for the capital improvements.

2.      However, after the bonds were issued in early 2008, instead of using the money for the much needed capital improvements, the president and the board of directors of the Debtors caused millions of dollars to be used for a startup project in the state of Washington. What is more, the officers and directors of the Debtors did the bulk of this while the Debtors were insolvent and/or undercapitalized.

3.      By causing the transfers to be made as described herein, the president of the Debtors, Richard Olson, wasted corporate assets and breached his fiduciary duties to the Debtors, the Debtors' creditors, and/or the residents of the retirement community.  Then, by willfully and wantonly approving the actions and/or failing to ensure that the funds of the Debtors were appropriately spent, the boards of directors of the Debtors did the same.

4.      The damage caused by the waste of corporate assets and the breaches of fiduciary duties was significant.  The officers and directors of the Debtors caused over $10,000,000 to be transferred to (or for the benefit of) the startup project in the state of Washington and related grandiose plans. Approximately $5,000,000 of the transfers were actually made after the Debtors

2

were insolvent, undercapitalized, and specifically prohibited from making the transfers. Moreover, these transfers were not only a waste of corporate assets, they caused the deepening insolvency of the Debtors, an increase in the amount of debt owed by the Debtors to its creditors, a reduction in the value ultimately received from the sale of the Debtors' aging assets, and other related expenses.

5.     Not surprisingly, on February 4, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), initiating these bankruptcy cases (the "Cases") in the United States Bankruptcy Court for the Northern District of Illinois.

6.     During the chapter 11 proceedings, the Debtors sold the retirement facilities located in Downers Grove and Rockford.  However, the sale of these assets recovered substantially less than the amount owed to the creditors, due at least in part to the failure of the officers and directors of the Debtors to ensure that the capital improvements referenced in the bond offering were made.

7.     On September 29, 2011 (the "Conversion Date"), the Bankruptcy Court converted the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.  Upon conversion of the chapter 11 cases, David Brown was appointed the Chapter 7 Trustee, and he continues to serve in that capacity.  By this action, the Trustee seeks to recover the damages caused by the acts of the officers and directors of the Debtors as described herein.

**Jurisdiction And Venue**

8.     The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois, in that portions of this adversary proceeding (a) arise under §§

101, *et seq.* of the Bankruptcy Code, (b) arise in the above-captioned case (the "Cases") pending before this Court, and/or (c) are related to the Case. This matter constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

9.      This matter arises in the Cases pending before this Court and thus venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Parties

10.      The Plaintiff, David R. Brown, not individually but solely in his capacity as Chapter 7 Trustee of the above captioned bankruptcy estates, is the duly appointed and acting Chapter 7 trustee of these Cases.

11.      Defendant Richard W. Olson was the president of the Debtors during all relevant times referred to herein.  Mr. Olson resides at 371 E. Ranney Ave. in Vernon Hills, Illinois 60061-4134.

12.      Defendant Mila G. Carlson was a member of the board of directors of the Debtors from 2005 to the Petition Date.  Ms. Carlson resides at 2344 Ohio Parkway in Rockford, Illinois 61108.

13.      Defendant Robert Carlson was a member of the board of directors of the Debtors from 2004 to the Petition Date.  Mr. Carlson resides at 8629 Secret Way Drive in Roscoe, Illinois 61073.

14.      Defendant Rodney C. Dahlin was a member of the board of directors of the Debtors from 1970 to the Petition Date.  Mr. Dahlin resides at 526 Lakeshore Drive in Sawyer, Michigan 49125-8323.

15.      Defendant Bruce V. Erickson was a member of the board of directors of the Debtors from 1974 to the Petition Date.  Mr. Erickson resides at 212 Fairway Court in Prospect

Heights, Illinois 60070.

16.        Defendant James G. Erickson was a member of the board of directors of the Debtors from 2005 to the Petition Date.  Mr. Erickson resides at 0N305 Armstrong Lane in Geneva, Illinois 60134.

17.        Defendant Timothy S. Hultgren was a member of the board of directors of the Debtors from 1995 to the Petition Date.  Mr. Hultgren resides at 1N401 Indian Knoll Road in West Chicago, Illinois 60185.

18.        Defendant Warren N. Jensen was a member of the board of directors of the Debtors from 1989 to the Petition Date.  Mr. Jensen resides at Bethany Beach, 12684 Oak Park Avenue, Unit 25 in Sawyer, Michigan 49125-9160.

19.        Defendant Carol E. Middleton was a member of the board of directors of the Debtors from 2005 to the Petition Date.  Ms. Middleton resides at 5621 Forest View Avenue in Rockford, Illinois 61108.

20.        Defendant Carol Schaub was a member of the board of directors of the Debtors from 1992 to the Petition Date.  Ms. Schaub resides at 4417 Nicklaus Drive in Lawrence, Kansas 66047.

21.        Defendant David Schleicher was a member of the board of directors of the Debtors from 2004 to the Petition Date.  Mr. Schleicher resides at 1531 National Avenue in Rockford, Illinois 61103.

22.        Defendant Robert L. Smyth was a member of the board of directors of the Debtors from 2003 to the Petition Date.  Mr. Smyth resides at 100 Timber Ridge Way in Issaquah, Washington 98027.

23.        Defendant Richard S. Walker was a member of the board of directors of the

Debtors from 1992 to the Petition Date. Mr. Walker resides at 7741 Sequoia Court in Orland Park, Illinois 60462.

24. Defendant Douglas Walton was a member of the board of directors of the Debtors from 2002 to the Petition Date. Mr. Walton resides at 558 Westfield Course in Geneva, Illinois 60134.

25. Defendant John Westra was a member of the board of directors of the Debtors from 1994 to the Petition Date. Mr. Westra resides at 26W271 Enders Lane in Winfield, Illinois 60190.

26. Defendant James T. Whitman was a member of the board of directors of the Debtors from 2003 to the Petition Date. Mr. Whitman resides at 2724 - 224th Avenue, N.E. in Sammamish, Washington 98074.

27. Defendant Donald E. Zimmerman was a member of the board of directors of the Debtors from 2005 to the Petition Date. Mr. Zimmerman resides at 709 - 71st Street in Darien, Illinois 60561.

## The Facts

28. Fairview Ministries, Inc., Fairview Village, Fairview Baptist Home, and Fairview Residence of Rockford (collectively, the "Fairview Obligated Group"), were Illinois not-for-profit corporations that owned and/or operated continuing care retirement communities in Downers Grove and Rockford, Illinois. A portion of the retirement facilities had been operating in some form for over one hundred years.

### The Fairview Obligated Group's Facilities Required Capital Improvements

29. Predictably, in 2007, the facilities owned by the Fairview Obligated Group were in need of significant capital improvements. However, at that time, the Fairview Obligated

Group had already incurred over $45,000,000 in existing debt to bondholders from a 2004 bond issuance. As a result, the officers and directors decided to refinance their existing debt through a larger bond issuance which would allow the Debtors to not only pay off their existing bond debt, but also to complete the capital improvements which were badly needed at the retirement communities in Downers Grove and Rockford, Illinois.

### The 2008 Bond Issuance

30.     In early 2008, the Fairview Obligated Group caused bonds with a value of $57,235,000 to be issued through the Illinois Finance Authority. The official statement for the bonds was consistent with the facts stated above and specifically represented that the bonds were issued primarily to: "(i) refund certain revenue bonds, $45,210,000 of which are currently outstanding …; (ii) pay or reimburse the Obligated Group for the costs of certain capital expenditures for the Obligated Group's facilities; (iii) establish a Debt Service Reserve Fund with respect to [certain new bonds]…; and (iv) pay certain expenses incurred in connection with the issuance of [certain new bonds]..."

### The Transfers Outside the Obligated Group

31.     Unfortunately, the president and certain members of the board of directors of Fairview Ministries had other ideas. For example, Richard Olson, the president of Fairview Ministries, who had previously served as Chief Financial Officer of a much larger group of retirement communities, had ambitious plans to quickly expand Fairview Ministries.

32.     As a result, in spite of the much needed capital improvements in Downers Grove and Rockford, and in spite of the stated purpose of the bond issuance, the president of Fairview Ministries caused the Fairview Obligated Group to transfer millions of dollars to a startup retirement community near Seattle, Washington. Moreover, he accomplished this by transferring

over $10,000,000 from the Fairview Obligated Group to separate entities that were not otherwise responsible to the Debtors' creditors or the Debtors' residents.

## The Officers and Directors

33.      During this process, when certain members of the Fairview Obligated Group boards of directors and others voiced opposition to the president's actions, the president either forced them to resign or shouted them down.  Until, at the end of the day, the president had caused the Fairview Obligated Group to transfer over $10,000,000 in support of his grandiose expansion plans while leaving most of the needed capital improvements in Downers Grove and Rockford unfinished at the time the Debtors filed for bankruptcy protection.

34.      Meanwhile, the Fairview Obligated Group boards of directors, the individuals with a duty of care and loyalty to the Fairview Obligated Group and ultimately its creditors, either approved the president's actions or failed to ensure that the Fairview Obligated Group's funds were spent as required.  Moreover, they did this in conscious disregard of  the capital improvements which they knew were needed, the purposes and restrictions associated with the refinancing and the bond issuance, and the need to maintain enough working capital to continue to operate, regardless of the restrictions.

## The Transfers To The Pacific Northwest Project

35.      The bulk of the damage caused by the Defendants' breach of their fiduciary duties and the waste of the Fairview Obligated Group's corporate assets is evidenced by the amount of transfers to (or on behalf of) the following four entities:

| | | |
|---|---|---|
| a. | Fairview Ministries Northwest | $6,056,958 |
| b. | Fairview Ministries Properties, LLC | $2,251,322 |
| c. | Fairview Management & Development Services | $2,888,223 |
| d. | Fairview Elder Services | $92,055 |
| | | $11,288,558 |

Three of these four entities were created to own, operate, and/or develop the hoped-for large new retirement facility in the Pacific Northwest near Seattle, Washington, which was never even built. The fourth was created for another expansion project.

### The Religious Mission And Expansion

36.     Part of the mission of the officers and directors of the Fairview Obligated Group was to promote Baptist and/or Evangelical beliefs in connection with providing retirement communities for the elderly. While all of the facilities owned by the Fairview Obligated Group were located in Illinois, eventually the officers and directors sought to spread their mission to new parts of the country.

### Fred Lind Manor

37.     Fred Lind Manor was, and is, a not-for-profit corporation that operates a small, 82-unit independent and assisted living facility in Seattle, Washington. Fred Lind Manor shared the Fairview Obligated Group's Evangelical mission and sought a larger company to assist it in developing a large continuing care retirement facility near Seattle, Washington.

### The Creation Of New Entities

38.     In furtherance of this plan to expand, Fred Lind Manor and Fairview Ministries created a Washington "nonprofit corporation" named Fairview Ministries Northwest. However, the new facility was not supposed to be owned by Fairview Ministries Northwest. Rather, the new facility was supposed to be owned by another Washington nonprofit corporation named Fred Lind Elder Services.

39.     In connection with this proposed development, Fairview Ministries was simply supposed to assist Fairview Ministries Northwest in developing the hoped-for community in the Pacific Northwest.

## The Creation of Conflicts of Loyalty

40.     In connection with the creation of these new entities in the state of Washington, a conflict of loyalties was created.  Specifically, Fred Lind Manor (the Washington based nonprofit corporation), required that Fairview Ministries put two members of Fred Lind Manor's board of directors onto the Fairview Ministries board of directors.  This meant that the Fred Lind Manor board members who sat on the Fairview Ministries board of directors, to wit Robert Smythe and James Whitman, possessed a loyalty to Fred Lind Manor even while they sat on the board of Fairview Ministries.

41.     Moreover, these directors possessed a conflict of loyalties when they voted on, approved, or failed to prevent, the transfer of millions of dollars from Fairview Ministries to the Pacific Northwest entities they helped create and upon whose boards they also sat.

42.     In addition, the members of the Fred Lind Manor board of directors also possessed a personal interest in developing a large retirement facility where they lived and/or worked.

43.     Conversely, members of the Fairview Ministries board of directors were appointed as members of the board of directors of Fairview Ministries Northwest.  Once again, this created a conflict of loyalties.

44.     Having Members of the Fairview Ministries board of directors appointed to the Fairview Ministries Northwest Board of directors meant that board members of Fairview Ministries also possessed a loyalty to Fairview Ministries Northwest.  Moreover, this conflict of loyalties existed during the period when Fairview Ministries transferred millions of dollars to Fairview Ministries Northwest and its affiliates which owned and were expected to develop the Pacific Northwest Project.

**Fairview Ministries Northwest Purchased Land With The Money
Of The Fairview Ministries**

45.     Evidence of the result of the conflict of loyalties includes Fairview Ministries Northwest purchasing large tracts of land with the money of Fairview Ministries.  For example, on January 2, 2007, Fairview Ministries Northwest purchased a 17-acre parcel of land north of Seattle for the development of the speculative continuing care retirement facility.  Fairview Ministries Northwest agreed to pay $2,380,000 for the land.

46.     Fairview Ministries Northwest obtained financing for the purchase from a Washington state bank called Evergreen Bank.

47.     However, Fairview Ministries (despite not owning the land), actually paid for the land.  Fairview Ministries did this by funding two "collateral" deposit accounts, one in the amount of $250,000 (believed to be in the name of Fairview Ministries Northwest) and the other in the amount of $500,000 (believed to be in the name of Fairview Ministries) at Evergreen bank.

48.     Richard Olson then caused Fairview Ministries to make payments to Evergreen Bank for years in order to comply with and reduce the amount owed on the loan given to Fairview Ministries Northwest.  He did this even after the Fairview Ministries (and the Fairview Obligated Group) were insolvent and/or undercapitalized.  He did this in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance.

**Fairview Ministries Northwest Purchased Additional Land With The Funds Of
Fairview Ministries**

49.     In September 2007, Fairview Ministries Northwest purchased an additional twenty acres of land for the Pacific Northwest Project.  This time, the purchase price was $11,000,000.

50.     Despite the fact that Fairview Ministries Northwest purchased the land, Fairview

Ministries once again paid for the land.

51.     Specifically, Fairview Ministries paid the $350,000 down payment required for the purchase.  In addition, even though Fairview Ministries Northwest had bought the land and executed the promissory note to the land owners for the remaining $10,650,000, Fairview Ministries (or a member of the Fairview Obligated Group) actually made all of the payments due under the note (prior to defaulting).

### The Defendants Disguised And/Or Concealed A Portion Of The Transfers To The Pacific Northwest Project

52.     While these large transfers were being made to the Pacific Northwest Project, the facilities actually owned and operated by the Fairview Obligated Group in Illinois required extensive capital improvements.  The transfers out of the Fairview Obligated Group not only violated reasonable business practices, they were also prohibited by the terms of the 2008 bond issuance.

53.     The official statement for the 2008 bond issuance represented that the bonds were issued primarily to pay for the capital expenditures needed for the Fairview Obligated Group facilities.  See, above.  In addition, in connection with the bond issuance, the Fairview Obligated Group agreed to meet certain standards which were consistent with reasonable business practices and the operation of the continuing care retirement facilities in Downers Grove and Rockford, Illinois.

### Days Cash On Hand

54.     One such standard set forth in the 2008 bond issuance required the Fairview Obligated Group to maintain 180 "Days Cash On Hand."  The Days Cash On Hand ("DCOH") covenant means basically what it says.  In order to keep within reasonable and sound business practices, the Fairview Obligated Group needed to keep at least 180 days of unrestricted cash on

hand for the operation of its business.

55.     Therefore, in this case, the officers and directors of the Fairview Obligated Group not only had a duty of care to operate the corporations in a reasonable manner, they also had established written benchmarks which were consistent with good business practices to which they could refer.

56.     If the Fairview Obligated Group did not keep at least 180 Days Cash On Hand, the Fairview Obligated Group could not, and should not, transfer cash or property out of the Fairview Obligated Group.  It was both unreasonable and prohibited.

57.     Thus, the officers and directors of the Fairview Obligated Group, in evaluating the manner in which the corporation was being operated by the officers, could look to specific written terms that would indicate whether the business was being operated in a reasonable manner.

58.     In this case, the officers and directors breached their fiduciary duties by causing and/or allowing the Fairview Obligated Group to continue to transfer approximately $5,000,000 outside of the Fairview Obligated Group to the Pacific Northwest Project after the Debtors had less than 180 Days Cash On Hand.

**The Debt Service Coverage Ratio**

59.     Similarly, there was a standard set forth in the 2008 bond issuance related to the Fairview Obligated Group's Debt Service Coverage Ratio ("DSCR").  The Debt Service Coverage Ratio is a ratio which reveals the positive or negative cash flow of a business over a period of time. In other words, the DSCR reveals how much more (or less) income an entity generates for a certain period of time in relation to the debts that the entity will have to pay in that same period.

60.     In this case, reasonable business practices as well as the documents related to the bond issuance required the Fairview Obligated Group to maintain a Debt Service Coverage Ratio of 1.25 to 1 or 125% of the actual debt service required over a specified period.

61.     Therefore, once again, the officers and directors of the Fairview Obligated Group not only had a duty to operate the corporation in a reasonable manner, they also had established written benchmarks which were consistent with good business practices to which they could refer.

62.     Thus, the officers and directors of the Fairview Obligated Group, in evaluating the manner in which the corporation was being operated by the officers, could look to specific written terms that would indicate whether the business was being operated in a reasonable manner.

63.     In this case, the officers and directors again breached their fiduciary duties by causing and/or allowing the Fairview Obligated Group to operate unchecked with a Debt Service coverage Ratio below 1.25 to 1, including continuing to transfer approximately $5,000,000 outside of the Fairview Obligated Group to the Pacific Northwest Project after the Debtors failed to have a reasonable Debt Service Coverage Ratio.

## The Officers Also Breached Their Duties By Miscalculating Or Misstating The DCOH and DSCR

64.     In addition to the directors' breaches of their duties, at various points in time the officers of the Fairview Obligated Group breached their duties by miscalculating or misstating the Days Cash on Hand and the Debt Service Coverage Ratio through incorrectly including restricted cash in their calculations.

65.     For example, Richard Olson, as president of the Fairview Obligated Group, misstated the Days Cash On Hand and the Debt Service Coverage Ratio calculations by

including funds which had been pledged as collateral to Evergreen Bank and the Baptist General Conference Cornerstone Fund (i.e., restricted funds) in the calculations.

## The Baptist General Conference Cornerstone Fund

66.     The Baptist General Conference is a nationwide association of approximately 1,000 Evangelical Baptist churches.  The Baptist General Conference created a development fund called the "Cornerstone Fund."

67.     One of the purposes of the Cornerstone Fund is to offer loans to churches for building and remodeling purposes.  It does this, in part, through money invested in the fund.  For example, the Baptist General Conference offers certificates of deposit which promise to pay the owner of the certificate the entire principal invested plus interest.

68.     In this case, Richard Olson (as president of Fairview Ministries) caused Fairview Ministries to invest $1,000,000 in certificates of deposit with the Baptist General Conference Cornerstone Fund.  Then, he turned around and pledged these same certificates of deposit to the Baptist General Conference Cornerstone Fund to secure a $1,000,000 loan to Fairview Ministries Northwest.  Afterwards, when Fairview Ministries Northwest defaulted on the loan, Mr. Olson caused Fairview Ministries to pay off the loan of Fairview Ministries Northwest by using Fairview Ministries' certificates of deposit and applying them to the debt of Fairview Ministries Northwest.  In other words, instead of protecting the assets of the Fairview Obligated Group, the president used the Cornerstone Fund to transfer $1,000,000 outside of the Fairview Obligated Group.  Moreover, he did this at a time during which the Fairview Obligated Group was insolvent or undercapitalized and the Fairview Obligated Group was otherwise prohibited from doing so.

69.     Ultimately, when the loan became due to the Baptist General Conference from

Fairview Ministries Northwest, Richard Olson, as president of Fairview Ministries, breached his fiduciary duties to Fairview Ministries and its creditors by causing Fairview Ministries to pay off the loan from the Baptist General Conference Cornerstone Fund despite the fact that the proceeds had been used to benefit Fairview Ministries Northwest.

70.     Richard Olson, as president, also made similar errors related to $500,000 in an account allegedly pledged to Evergreen Bank by Fairview Ministries on behalf of Fairview Ministries Northwest, as well as with regards to certain deposits made by residents of the retirement communities, and expenses owed by the Fairview Obligated Group for health care claims.

### The President And The Board Of Directors Continued To Transfer Funds Outside Of The Fairview Obligated Group After Knowing The Fairview Obligated Group Was Not Healthy Financially And Had Less Than 180 Days Cash On Hand

71.     Prior to the December 2008 annual meeting of the board of directors of the Fairview Obligated Group, the directors were given a financial report, which indicated that the Fairview Obligated Group was not healthy financially and held only 146 Days Cash On Hand.

72.     At that meeting, certain directors voiced concerns regarding the financial condition of the Fairview Obligated Group, as well as concerns regarding the actions of the president, Richard Olson.  However, Mr. Olson, as president, argued vociferously and by the end of the meeting no resolutions preventing any additional transfers outside of the Fairview Obligated Group were made, and the board allowed the president to continue to run the business in an unreasonable and prohibited manner.  As a result, millions of dollars continued to flow out of the Fairview Obligated Group, despite the transfers being both unreasonable under the circumstances and prohibited by the 2008 bond issuance.

**The Fairview Obligated Group's Financial Condition Continued to Worsen, But Unreasonable and Prohibited Transfers Continued to Be Made**

73.     The Fairview Obligated Group's financial condition continued to worsen in 2009. By June 2009, Days Cash On Hand was reported in the range of 100-105, well below the Days Cash On Hand standard of 180.

74.     Nevertheless, the Fairview Obligated Group continued to transfer funds outside of the Fairview Obligated Group at the president's insistence without curtailment or prohibition from the board of directors.

75.     In the fiscal year ending in 2009, the Fairview Obligated Group transferred approximately $2,000,000 to the Pacific Northwest project.

76.     By mid-2009, the Pacific Northwest project had ground to a halt. In fact, the project's staff was let go by late 2009. Yet, transfers continued to be made.

**The Fairview Obligated Group Continued To Pay The Debts of Fairview Northwest**

77.     Despite its overall financial struggles, as well as the hopeless nature of the Pacific Northwest Project, in January of 2010, Fairview Ministries paid off the $1,000,000 loan mentioned above which had been advanced for the benefit of Fairview Northwest for the Pacific Northwest project.

**The Capital Projects Had Still Not Been Completed**

78.     Around this period, a consulting firm, Continuum Development Services ("CDS"), conducted a liquidity analysis which concluded that the Fairview Obligated Group still faced a $4,600,000 liability over the ensuing eighteen month period for capital expenditures. The report also estimated there was still approximately $5,000,000 in deferred maintenance liability at the Fairview Obligated Group facilities.

79.     By this time, the Fairview Obligated Group had transferred over $11,000,000

outside of the obligated group. In other words, even though the Fairview Obligated Group had issued bonds through the Illinois Finance Authority in order to pay for the capital expenditures needed for its facilities, the capital improvements had not been completed. Instead, millions of dollars had been transferred outside of the Fairview Obligated Group, in derogation of reasonable corporate practices as well as the standards set forth in the documents related to the 2008 bond issuance

80.     On February 4, 2011, the Debtors finally filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  At the time the bankruptcy petitions were filed, the Debtors owed over $55,000,000 related to the bonds, over $1,500,000 related to other financing, over $1,000,000 to trade vendors for goods and services rendered, and almost $3,000,000 for entrance fee refunds to former residents that no longer resided at the continuing care retirement communities.

81.     The Debtors and their Bankruptcy Estates do not have sufficient assets to satisfy the claims of their creditors.  Significant losses of the Debtors' assets, as well as the creditors' claims, could have been avoided if the Debtors' officers and directors had acted in the best interests of the Debtors, its creditors, and the residents of the facilities owned by the Debtors instead of transferring millions of dollars outside of the Fairview Obligated Group, mainly to the speculative startup project.

## COUNT I
### (Breach Of Fiduciary Duties - Officer)

82.     The Trustee realleges the allegations contained in paragraphs 1 through 81 above, as paragraph 82 of this Count I.

83.     The Debtors' officers owed a fiduciary duty to exercise reasonable care, skill and diligence in fulfilling their responsibilities.  This duty required them to exercise the care and skill

reasonably expected from persons having their knowledge, expertise, and experience in the industry.

84.     In addition, because the Debtors were insolvent by at least December 31, 2008, the officers of the Debtors were bound to act not only in the best interests of their respective entity, but also that entity's creditors.

85.     Richard Olson, the president of the Debtors, breached his duty of care by, among other things:

     a.  Causing millions of dollars to be transferred from the Debtors, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

     b.  causing and/or allowing loans and advances from the Debtors to entities that the officers and directors controlled, including, but not limited to, Fairview Northwest, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

     c.  causing and/or permitting the Cornerstone "Investment" and/or Loan, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance and ultimately transferring $1,000,000 on behalf of another entity at a time when the Debtor was undercapitalized and/or insolvent;

     d.  causing and/or permitting the Debtors to pledge its assets, while undercapitalized and/or insolvent, for the benefit of other entities, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

     e.  causing and/or approving transfers to entities not responsible or liable to the

Debtors' creditors for little or no consideration;

f. all of the additional reasons stated above.

86. As a direct and proximate result of the president's breaches of his duty of care, the Debtors and the Debtors' creditors were damaged through the waste of corporate assets, a deepening insolvency, an increase in the amount owed to the creditors, and a reduction in the value ultimately received from the sale of the Debtor's assets (which were in serious need of capital improvements), plus other expenses, in an amount in excess of $5,000,000 to be proven at trial.

WHEREFORE, the Trustee requests that judgment be entered in his favor and against the Defendant officer, president Richard Olson, in an amount to be proven at trial including all actual damages, including compensatory and consequential damages, plus costs, including reasonable attorney fees, expert fees, and such other relief, both at law and in equity, as this Court deems just and proper.

## COUNT II
### (Breach Of Fiduciary Duties - Directors)

87. The Trustee realleges the allegations contained in paragraphs 1 through 86 above, as paragraph 87 of this Count II.

88. Under Illinois law, directors of a non-profit corporation stand in a fiduciary relationship to the non-profit corporation. Illinois Courts have recognized that the fiduciary duties of a director include both a duty of care and a duty of loyalty.

89. The duty of care requires that a director of a non-profit must discharge his or her duties in good faith, with the care that an ordinarily prudent person in a like position would reasonably believe appropriate under similar circumstances.

90. The Defendant directors in this case willfully and wantonly breached the

fiduciary duty of care they owed as directors as stated above. In particular, the Defendant directors breached their duty of care by, amongst other things, willfully and wantonly approving the following actions and/or failing to ensure that the actions were not taken and that the funds of the Debtors were appropriately spent:

a. Causing or allowing millions of dollars to be transferred from the Debtors, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

b. approving and/or allowing loans and advances from the Debtors to entities that the officers and directors controlled, including, but not limited to, Fairview Northwest, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

c. approving and/or permitting the Cornerstone "Investment" and/or Loan, , in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance and ultimately transferring $1,000,000 on behalf of another entity at a time when the Debtor was undercapitalized and/or insolvent;

d. approving and/or permitting the Debtors to pledge its assets, while undercapitalized and/or insolvent, for the benefit of other entities, in violation of reasonable business practices as well as the restrictions related to the 2008 bond issuance;

e. approving and/or permitting transfers to entities not responsible or liable to the Debtors' creditors for little or no consideration;

f. failing to monitor and become aware of the Debtors' financial obligations under the relevant bond covenants;

g.  failing to monitor and become aware of the transfers that occurred in violation of the relevant bond documents and resulted in the waste of corporate assets;

h.  failing to monitor and become aware of the officers' decisions regarding the transfer of the Debtors' assets to affiliates and other actions which constituted waste of corporate assets;

i.  failing to monitor and become aware of the damage caused to the Debtors by the imprudent use of corporate assets and the need to stop these actions;

j.  causing and/or approving transfers to entities not responsible or liable to the Debtors' creditors for little or no consideration;

k.  all of the additional actions stated above.

91.     Moreover, the Director Defendants did this while knowing what the reasonable standards were in the situation and that the actions failed to comply with reasonable standards and practices as well as the terms of the bond issuance.

92.     Defendant Directors' acts and omissions, as set forth above, constitute recklessness, gross negligence, and gross mismanagement of the Debtors' affairs and a gross violation of the duties the Directors owed.

93.     The directors of the Debtors also owed their respective entities a fiduciary duty of loyalty, which required them to have an undivided and unselfish loyalty. The fiduciary duty of loyalty included, among other things, a duty to act in the best interest of the Debtors, and to avoid conflicts, and to exercise their power for a proper purpose.

94.     The Debtors' directors failed to act in good faith as was required by the fiduciary duty of loyalty. Instead of acting in the best interests of the Fairview Obligated Group entities of which they were members of the board of directors, they acted in the best interests of the non-

Fairview Obligated Group entities as described above

95.     As a direct and proximate result of the Director defendants breaches of duties, the
Debtors and the Debtors' creditors were damaged through the waste of corporate assets, a
deepening insolvency, an increase in the amount owed to the creditors, and a reduction in the
value ultimately received from the sale of the Debtor's assets (which were in serious need of
capital improvements), plus other expenses, in an amount in excess of $5,000,000 to be proven at
trial.

WHEREFORE, the Trustee requests that judgment be entered in his favor and
against the Defendant Directors, jointly and severally, in an amount to be proven at trial
including all actual damages, including compensatory and consequential damages, plus costs,
including reasonable attorney fees, expert fees and such other relief, both at law and in equity, as
this Court deems just and proper.

## COUNT III
### (Waste Of Corporate Assets – All Defendants)

96.     The Trustee realleges the allegations contained in paragraphs 1 through 95 as
paragraphs 96 of this Count III.

97.     The Debtors stood to gain little or nothing from the transfers from the Fairview
Obligated Group to Fairview Ministries Northwest and other entities outside the Fairview
Obligated Group.  These transactions were the result of utter indifference and conscious
disregard on the part of the directors and officers.

98.     These transactions were so one sided that no business person of ordinary, sound
judgment could conclude that the Debtors received adequate consideration in return.

99.     Therefore, the approval and/or allowance of the transfer of the Debtors' assets to
Fairview Ministries Northwest and other entities outside the Fairview Obligated Group by the

directors and officers constituted a waste of corporate assets.

100. The Debtors and the Debtors' creditors have been damaged by a deepening insolvency, an increase in the amount owed to the creditors, and a reduction in the value ultimately received from the sale of the Debtor's assets (which were in serious need of capital improvements), plus other expenses, in an amount in excess of $5,000,000 to be proven at trial.

WHEREFORE, the Trustee requests that judgment be entered in his favor and against the Defendant Officer and Directors, jointly and severally, in an amount to be proven at trial including all actual damages, including compensatory and consequential damages, plus costs, including reasonable attorney fees, expert fees and such other relief, both at law and in equity, as this Court deems just and proper.

Respectfully Submitted,

David R. Brown, not individually, but solely as Chapter 7 Trustee for the Bankruptcy Estates

By:     /s/ Daniel P. Dawson
         One of its Attorneys

Daniel P. Dawson (ARDC #6199728)
Joseph A. Ptasinski (ARDC #6306772)
Nisen & Elliott, LLC
200 West Adams Street, Suite 2500
Chicago, Illinois 60606-4637
(312) 346-7800